*Case No. 1:25-cv-04058-EFM-BGS*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO**
*4:21 pm, Apr 15, 2026*
**JEFFREY P. COLWELL, CLERK**

Civil Action No. 1:25-cv-04058-EFM-BGS

**BRENDAN BAKER,**
     *Plaintiff, Pro Se,*

v.

**CONTINUING LEGAL EDUCATION IN COLORADO, INC.;
THE COLORADO BAR ASSOCIATION; and
THE DENVER BAR ASSOCIATION,**
     *Defendants.*

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

### I. INTRODUCTION

1. This case involves a statewide organization that charges attorneys for courses on legal ethics and compliance, and promotes itself as a defender of marginalized groups, while refusing to follow the very laws and values it teaches. Plaintiff Brendan Baker is a Black, gay, licensed attorney who was repeatedly hired by the Colorado Bar Association and its affiliated entities, with a mandate to help bring the organization into the future by disrupting acknowledged patterns of discrimination. For seven years, Defendants exploited Plaintiff's legal skills, writing talent, reputation, and diverse identity across three nominally separate organizations, while subjecting him to a hostile environment, treating him differently based on his status, and denying him the title, compensation, and advancement his qualifications and performance warranted.

2. When Plaintiff attempted to fulfill his mandate of connecting the Bar with its diverse attorney population, he was criticized for "sharing his perspective" in a way that "made others uncomfortable." When Plaintiff raised specific concerns about discrimination, he was ignored by leadership at all levels. When he filed formal complaints with state and federal agencies, he was subjected to retaliatory evaluations, hostile meetings, and ultimately constructive discharge — two days after state investigators sent formal anti-retaliation notice to Defendants' office.

3. Throughout Plaintiff's employment and continuing through this federal litigation, Defendants maintained no human resources function, no complaint procedure, no compliant job postings, no objective evaluation criteria, and no mechanism for their 160-member governing board to learn of or respond to staff concerns. Every avenue of institutional accountability was either absent by design or dismantled when someone tried to apply it. Despite years of massive turnover, controversial executive resignations, and pressing questions from members and the public, employees were left unprotected. Plaintiff was just one of many people harmed by the Bar during this period. This amended complaint sets forth what happened, and to whom, in specific and documented detail. It is filed so that the Court, and Defendants' own governing bodies, may finally assess the full scope of what occurred.

4. Plaintiff brings this action under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Colorado Anti-Discrimination Act ("CADA"), C.R.S. 24-34-301 et seq., the Equal Pay for Equal Work Act ("EPEWA"), C.R.S. §§ 8-5-101 et seq., and Colorado common law. He seeks compensatory damages, uncapped punitive damages, injunctive relief requiring structural reform, and attorney's fees at market rates for the substantial legal work he has performed on his own behalf due to the insurmountable conflicts Defendants created in securing Colorado representation.

## II. PARTIES

5. Plaintiff Brendan Baker ("Plaintiff") is a multiracial Black and gay man who is a citizen of the United States and Canada. He was employed by Defendants from approximately December 2017 through August 2024, with a six-month interruption in 2022, and resided in the Denver, Colorado metro area throughout the relevant period. Plaintiff is a licensed attorney admitted to the bar of the State of Maryland since 2012. He holds a Juris Doctor from the University of Michigan Law School, where he was a Darrow Scholar with a full scholarship and stipend award. Prior to law school he worked as a paralegal at a national firm for four years. Apart from his legal work, Plaintiff is a trained historian, with a B.A. in History/Medieval & Renaissance Studies from Carleton College, a top-10 liberal arts program in Northfield, MN, which he attended as a National Merit Scholar. He studied at Oxford University for a year and did two years of independent research, funded by a Mellon Mays Undergraduate Fellowship, that led to the publication of two peer-reviewed papers. In law school, Plaintiff was a faculty research assistant, an associate editor on the Michigan Journal of International Law, and a student attorney in the Washtenaw County Office of Public Defender. He co-chaired the Michigan Outlaws LGBT student group for two years, tripling its membership and earning awards for the organization by cross-marketing events with other student groups. He also sang and played guitar in the law school rock band, T.J. Hooper and the Learned Hands, performing at venues around Ann Arbor. After graduation, Plaintiff briefly worked for a non-profit in Baltimore that placed lawyers in high school classrooms to help students better understand their rights. He then clerked for the Honorable Corinne Beckwith on the District of Columbia Court of Appeals. Plaintiff was

the first judicial clerk hired by Judge Beckwith after her appointment to the bench in 2011 by President Barack Obama. Plaintiff then practiced in pharmaceutical litigation for several years at a major national law firm, before moving to Colorado in 2016 to pursue new opportunities. In the past ten years, Plaintiff has written dozens of professionally published articles; created research guides and edited legal treatises still in use by practitioners all over Colorado; authored three novels; and developed and marketed digital applications built on large language models. Plaintiff's cultural skills include a working knowledge of French, Spanish, German, Latin, Old English, Old Norse, and Icelandic, and he has lived and worked in eight U.S. states and four countries. These qualifications and experiences were all directly relevant to his work for Defendants, from organizing networking and social events for lawyers, to editing and project managing legal publications.

6. Defendant Continuing Legal Education in Colorado, Inc. ("CBA-CLE") is a Colorado nonprofit corporation that serves as the educational arm of the Colorado Bar Association and the Denver Bar Association. CBA-CLE provides mandatory continuing legal education to approximately 16,000–20,000 Colorado attorneys, including virtually all attorneys admitted to practice in the District of Colorado and both state and federal judges, who also hold positions on its board. CBA-CLE was Plaintiff's direct employer from January 2020 - May 2022 and then October 2022 - August 2024.

7. Defendant Colorado Bar Association ("CBA") is a Colorado nonprofit corporation and voluntary professional association for attorneys licensed in Colorado. It is not the licensing body for Colorado lawyers, but it maintains close relationships with the Supreme Court, Office of Attorney Regulation, Department of Law, and judicial application and training pipelines. It is managed by an Executive Director and a Board of approximately 160 attorneys and government

officials, as well as a distinct Executive Council and Joint Management Committee. CBA shares office space, executive leadership, staff, and financial oversight with CBA-CLE. CBA directly employed Plaintiff from December 2017 through December 2019 and continued to manage him and benefit from his work thereafter.

8. Defendant Denver Bar Association ("DBA") is a Colorado nonprofit corporation and voluntary professional association for attorneys in the Denver metropolitan area. DBA shares office space, executive leadership, and governance structures with CBA and CBA-CLE. DBA's publications were edited by Plaintiff, and DBA leadership participated in the management decisions at issue in this case.

9. **Single Employer/Integrated Enterprise.** CBA-CLE, CBA, and DBA operate as a single integrated enterprise for purposes of all claims asserted herein. They share: (a) the same physical office space at 1290 Broadway, Denver, Colorado; (b) the same executive leadership — Dan Sweetser simultaneously served as Executive Director of CBA-CLE and Deputy Executive Director of CBA, and Nicole Sperrazza currently serves as the Executive Director of both CBA and DBA, with direct management over CBA-CLE employees; (c) centralized control of labor relations through a Joint Management Committee ("JMC") that set salaries and titles across all three entities; (d) common financial oversight and reporting; (e) overlapping staff who performed work for all three entities simultaneously; and (f) a single governing board of 155–160 members. Throughout Plaintiff's employment, employees were transferred between entities, assigned duties spanning all three organizations, and managed by the same individuals regardless of which entity nominally employed them. [Exhibit 1] Exhaustion of administrative remedies against CBA-CLE therefore constitutes exhaustion against CBA and DBA, as they are a single employer under applicable law.

## III. JURISDICTION AND VENUE

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

11. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims under the Colorado Anti-Discrimination Act, C.R.S. §§ 24-34-301 et seq., the Equal Pay for Equal Work Act, C.R.S. §§ 8-5-101 et seq., and Colorado common law, as they arise from the same nucleus of operative facts.

12. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events giving rise to the claims occurred here.

13. Plaintiff has exhausted administrative remedies as to his Title VII and CADA claims by filing charges with the Colorado Civil Rights Division ("CCRD"), the Equal Employment Opportunity Commission ("EEOC"), and the Colorado Department of Labor and Employment ("CDLE"), and by receiving a Notice of Right to Sue. Administrative exhaustion against CBA-CLE constitutes exhaustion against CBA and DBA as a single integrated enterprise.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Pre-Employment Background

14. Plaintiff graduated from law school in 2011, and worked in the Washington, D.C. area until 2016. Plaintiff moved to Colorado in December 2016, and began working at the University of Denver Law Library while he sought a full-time position that would combine his legal expertise with his writing career, opening up new professional avenues and helping him build a portfolio. A publicly posted job described as "Writer/Editor at the Colorado Bar Association" appeared to be an ideal fit.

15. Plaintiff noted that CBA's published mission includes a commitment to "the eradication of racism, discrimination, and any other form of injustice against underrepresented groups" and the "removal of barriers to success within the CBA and the communities we serve." CBA's published values statement declares the organization "Inclusive," "Ethical," and "committed to actively changing systems, organizational structures, policies, practices, and attitudes, so that power is distributed and shared equitably and inclusively." Based on these publicly stated assurances, Plaintiff applied and was quickly invited to interview.

### B. The Hiring Interview: Defendants' Stated Preferences

16. In Plaintiff's team interview for the Writer/Editor position in December 2017, Communications Director Heather Folker told Plaintiff that the all-female communications team was concerned about hiring a male employee, and especially a lawyer. Folker explained that previous male employees had either sexually harassed female staff or caused problems by complaining about being underpaid. Folker stated that the organization therefore preferred to hire women and non-attorneys.

17. This was an extraordinary admission for a bar association to make in an interview with a licensed attorney. Plaintiff was taken aback, and responded: "Well, I am a Black, gay lawyer, so I won't be sexually harassing anyone, and in general I'm not 'down' with the patriarchy." Plaintiff also explained that he was focused on building a writing career and understood that the salary would be below what he could earn in traditional legal practice. From this moment, Defendants knew Plaintiff's race, sexual orientation, and gender, and had expressed an explicit organizational preference against at least two of his protected characteristics.

18. Plaintiff did not think he would be offered a position following this interview. However, Plaintiff's references for the position included Maria Krupinsky, an attorney recruiter at Venable LLP; Judge Corinne Beckwith on the D.C. Court of Appeals, for whom Plaintiff had clerked; and Karina Condra, law librarian at the University of Denver Sturm College of Law, who had supervised Plaintiff as a research attorney. In a subsequent interview, Greg Martin, the long-running Deputy Executive Director of CBA, told Plaintiff that these were the best references he had ever received, and that Plaintiff could help bring the Bar into the future.

19. Despite his reservations, Plaintiff accepted the position based on the strength of Martin's enthusiasm and the opportunity to explore and contribute to the Colorado legal community. He began work in December 2017 at a salary of $35,000 — a fraction of what his credentials and experience would command in any comparable legal or editorial role, but acceptable as a first full-time position in a new city and new career trajectory. Plaintiff knew by this point that the employee he was replacing, Jessica Volz, was a Ph.D. communications expert who had gone on to much higher paid positions at local law firms. This indicated that the role required high level professional skills and training, and had professional growth potential.

20. Greg Martin retired a few months later, and Plaintiff wrote his farewell article for

Colorado Lawyer magazine, as well as the articles announcing the Bar's move to new offices

later that year. [Exhibit 2] Martin was replaced by Amy (Redfern) Larson, who had been the

CBA's lobbyist for many years.

### C. Early Employment at CBA: Warning Signs (2018)

21. In Plaintiff's first month at CBA, he was approached by Sondra, a Black woman who

worked the reception desk. Plaintiff had spoken with Sondra during the interview process, and

her presence had reassured him that the office might be an inclusive environment. However,

Sondra informed Plaintiff that she had experienced direct discrimination throughout her

employment, that the organization had never taken remedial action, and that she had been

reassigned from a substantive role to reception as punishment for complaining. Sondra told

Plaintiff that she had been trying to leave but believed the organization had communicated

negative information about her to potential employers. Having finally secured a new position,

Sondra told Plaintiff explicitly that CBA as an organization was "really racist," and that he

should either leave immediately or use his legal training to protect himself.

22. Also in early 2018, Plaintiff attended an evening event in the shared office space with

CBA-CLE Legal Editor Kate Noble, a white woman. As the last two to leave the event, they

entered the elevator together. Plaintiff realized he had left his wallet at his desk, and stepped off

the elevator. Noble followed him, and asked Plaintiff what he was doing. Plaintiff explained he

was retrieving his wallet. Noble asked Plaintiff whether he had permission to be there. Plaintiff

reminded Noble that they had just left a meeting together, had been introduced on multiple prior

occasions, and had participated in several shared staff meetings. Noble repeated that she did not recognize Plaintiff. Upon reaching Plaintiff's office, Plaintiff pointed to his nameplate on the door and identified himself. Noble waited while Plaintiff retrieved his wallet from his desk. They returned to the elevator in silence. Noble did not apologize. At no point during Plaintiff's employment did he see any white employee or visitor questioned about their right to be in the office.

23. Plaintiff's role at CBA quickly expanded far beyond the Writer/Editor job description. He served as Editor-in-Chief of the Docket, DBA's flagship publication, where he managed editorial content, conducted interviews with DBA Presidents and Bar leaders, and produced a satirical column with DBA volunteers including Dan Sweetser and Geoff Anderson. [Exhibit 3] He managed Bar events in the evenings and weekends, signed contracts, took photographs, and then publicized the events to membership in a regular "Bar News" column for Colorado Lawyer, CBA's substantive legal publication. [Exhibit 4] And he acted as liaison to the DBA Young Lawyers Division, actively managing communications and out-of-office programming for this critical membership pipeline. In this role, he routinely heard the concerns of younger Bar members about patterns of intolerance they had experienced within CBA and DBA.

24. Notably, Plaintiff's CBA role required daily collaboration with CBA-CLE staff on shared projects for over two years before CBA-CLE hired him onto the Publications team. Plaintiff performed legal editing tasks for Colorado Lawyer, working directly alongside CBA-CLE Publications staff including Noble and Legal Editor Ellen Buckley in the shared office space. Noble and Buckley were not strangers when Plaintiff later joined their team — they had worked alongside him since 2018, as he successfully performed prominent editorial roles and membership management tasks.

25. In March 2018, CBA sent Plaintiff on a CLE Abroad trip to Cuba, after Communications Director Folker was unable to attend at the last minute. Despite being fewer than six months into his employment, Plaintiff was selected as the Bar's sole representative on a trip with members to a foreign nation lacking diplomatic relations with the U.S. However, Folker instructed Plaintiff not to tell other staff about the trip beforehand because they would be "jealous" and it might cause conflict — placing the burden of managing anticipated resentment on Plaintiff rather than addressing it as a management issue. Upon his return, Plaintiff wrote a feature article for the Docket, publicizing the program to members. [Exhibit 5] Multiple staff members then commented on how "tan" Plaintiff had gotten in Cuba, including comments such as "I wish my skin could get that dark." Folker's concerns about tension in the office appeared to be accurate.

26. During this period, several CBA and DBA officers left before completing their terms, and were replaced by new leaders who had to be interviewed and announced to members. These volunteers shared with Plaintiff in considerable detail the board-level conflicts affecting Bar leadership, including conflicts involving sitting judges. Several departing Bar leaders asked Plaintiff directly to see if he could improve the organization from within. Plaintiff was also asked by several members of staff to see if he could use his legal skills to advocate for employees. Plaintiff took this charge seriously, but recognized that he was being asked to address institutional problems without any of the institutional protections — title, authority, or even basic dispute resolution procedures — that would normally accompany such a responsibility.

**D. Salary Suppression and Title Manipulation (2019)**

27. After his first performance review, Plaintiff's salary was raised from $35,000 to $38,000. In his subsequent annual review, Communications Director Folker sent CBA Deputy Director Amy (Redfern) Larson a detailed memo indicating that Plaintiff was drastically underpaid and overworked, was irreplaceable, and should be moved into management. [Exhibit 6] This recommendation was not approved.

28. Around March 2019, Plaintiff learned that Vanessa Barbarsky, a white woman with a bachelor's degree, was earning approximately $52,000 as Membership Marketing Manager— a role functionally similar to Plaintiff's, with fewer public-facing responsibilities. Plaintiff was earning $38,000 with a Juris Doctor, a federal clerkship, and national law firm experience, performing comparable or more demanding work across three organizations. Shortly after Plaintiff learned of this disparity, Barbarsky was terminated, purportedly for performance issues, although she may have been unfairly blamed for inconsistencies in the membership numbers that Plaintiff also later discovered and presented to the board.

29. Based on Folker's evaluation and the open position, Plaintiff applied for the Membership Marketing Manager role. He interviewed and was hired in June 2019. However, after agreeing to accept the position, Plaintiff was informed that the title had been changed from Membership Marketing Manager to Membership Marketing Specialist, and the salary reduced to $42,000. Plaintiff later learned this downgrade was enforced by Dan Sweetser and other members of the Joint Management Committee. A white woman with a bachelor's degree had held the position at $52,000 with the "Manager" title, while a Black attorney with a JD received a lesser title and $10,000 less for the same work.

30. During this period, Plaintiff was also assigned a reception shift at the office's front desk, which required answering phones, accepting deliveries, signing members in for meetings,

and validating parking. This work was assigned to him despite his being a licensed attorney, despite reception duties having no relationship to his job functions, and despite no other lawyer on staff receiving a comparable assignment. Plaintiff was told everyone had to "chip in" due to staff turnover. Multiple employees and members questioned why an attorney was sitting at the front desk. The assignment was particularly concerning to minority staff who recognized the parallel to Sondra's experience — a Black woman who had been demoted from a substantive role to reception.

31. Around October 2019, CBA fired its Executive Director, Patrick Flaherty, a gay white man. Around the same time, Plaintiff's editorial role on the Docket was filled by Charles McGarvey, also a gay white man, who was given a higher salary and title in the role Plaintiff had performed for two years with additional responsibilities and lower pay. The first cover article published under his editorial leadership featured content from the wrong interview, with the wrong person, causing severe institutional embarrassment. McGarvey quit within less than a year, citing the difficulty of the job and a homophobic office environment. Shortly thereafter, the Docket was cancelled as a publication after 38 years.

32. In November 2019, CBA Deputy Director Amy Larson and Folker asked Plaintiff to be the first signatory on a petition to amend the organization's bylaws so that Larson, a white non-attorney, could assume the Executive Director role despite not having a law degree. Plaintiff signed under duress. He understood the fundamental injustice of being asked to help the organization change its rules to elevate a white, straight non-attorney while simultaneously denying the value of his own legal training and credentials.

33. Around this same period, a senior member of staff jokingly directed Plaintiff to insert a photograph of a monkey as a placeholder image for one of the DBA award recipients — a

Black man — who had not yet submitted his headshot. While this was not seemingly said with malicious intent, it was repeated several times. Plaintiff recognized the comment as racially offensive regardless of intent, but had no mechanism to address it. There was little understanding in the office of basic cultural sensitivity when speaking to or about minority members and staff.

34. Plaintiff and a junior member of staff were also asked to perform the physical labor of removing historical pictures of past Bar leaders from the office hallways, and staging the replacement photographs for professional hangers. The Bar later publicly stated they were responding to alleged complaints about the "old dead white guys" covering the walls. This was referenced on several occasions as something substantive the Bar had done in response to minority staff concerns, despite no other concerns ever being addressed, and despite the physical labor of removing the photos being delegated to Plaintiff, their only minority attorney. These incidents underscored the racial climate of the office, and the absence of any mechanism for Plaintiff to address such conduct.

35. While serving as Membership Marketing Specialist, Plaintiff was in charge of soliciting applications and writing promotional content for the many annual awards given by CBA and DBA. In late 2019, CBA gave a public service award to a mixed-race Black man who had built a career in civil rights advocacy for individuals falsely accused of sexual assault. After CBA publicly announced the award, they received complaints from members who discovered that the award recipient had himself been exonerated of criminal charges in a nationally covered legal case. CBA attempted to rescind the award with a tone-deaf and potentially libelous announcement. Plaintiff, also a mixed-race Black man, was placed in the position of educating leadership about the complicated racial and social dynamics of the situation. These discussions led to the creation of a crisis communications plan and changes to the CBA awards process, but

no measures were taken to support Plaintiff or other staff forced to educate leadership on deeply personal and sensitive issues as a function of their identities.

### E. Transfer to CBA-CLE and Immediate Retaliation (2020)

36. In December 2019, CBA-CLE Publications Director Kristin Huotari approached Plaintiff and offered him an opportunity to join her editorial team. Plaintiff had twice applied and interviewed for a Program Attorney position at CLE, both times after a new hire quickly departed, but was not offered the position on either occasion. [Exhibit 7] This new opportunity was framed as a comparable position on the editorial team. Although technically lateral on the organizational chart, the role was offered at $70,000 — nearly twice Plaintiff's CBA salary — because CBA-CLE, as a sales-funded nonprofit, paid more than CBA for equivalent roles despite sharing the same offices. After being told that the position would require managing a difficult team dynamic, and applying his expertise in communicating on behalf of the diverse membership of the bar, Plaintiff requested $75,000. The offer was then lowered to $68,500. This reduction appeared to be, and was implied by management to be, a decision by the same Sweetser-led JMC that had downgraded Plaintiff's title and salary the previous year. All parties agreed that the title of Attorney Editor best encompassed Plaintiff's responsibilities and credentials. [Exhibit 8]

37. Defendants' later CCRD filings framed Plaintiff's salary negotiation as unreasonable, and his title as "made up" for "unknown reasons." Defendants confirmed that Plaintiff's salary request had been denied because the $68,500 offer was "already more than a 50% salary increase" for Plaintiff, indicating that his below-market salary at CBA in a non-legal role was used directly to set his salary at CBA-CLE in an attorney role. [Exhibit 21] Defendants also

stated that "The compensation package requested by Charging Party would have resulted in him being the highest paid legal editor as it was almost $10,000.00 per year more than the individual he was replacing - a female who had been with the organization for over fifteen years." *Id.* This is an admission that Defendants knew they were paying existing staff below the posted range for a role, and that this decision was framed in explicitly gendered terms. Defendants did not identify which legal editor they were comparing Plaintiff to, whether that legal editor had a law degree and license, whether her role had included the additional duties assigned to Plaintiff, or whether Plaintiff's sixteen years of experience in the legal field and national-level credentials were comparable to that legal editor's background and training. Plaintiff was told only that one of the legal editors made more than he had requested, and one made less than he was offered, and that it was thus fair for him to make a salary somewhere between the two. It is also critical to note that the legal editor role had been posted at least twice without being filled, and Plaintiff's qualifications and experience exceeded the requirements for that position as posted, which is why he reasonably believed he was being offered a structurally different position with negotiable compensation.

38. Plaintiff was now explicitly being hired for his legal skills and insight, and underpaid relative to their market value or fair compensation within the context of the organization itself. After he informed CBA of his decision to accept the Attorney Editor role, Larson told him, "That's too bad, we were just about to give you that Manager title and salary you wanted," confirming that Plaintiff was performing his role successfully and simply having his advancement suppressed.

39. On Plaintiff's first day at CBA-CLE, Legal Editor Ellen Buckley — a white woman who had worked alongside Plaintiff in the shared office space for two years — confronted

Plaintiff over his title and salary. Buckley subsequently filed regulatory claims against the organization. Plaintiff was told by management this would not affect him. However, within two months, two-thirds of Plaintiff's managers were terminated. Despite numerous assurances to staff and members that a national executive search would occur, within three months Dan Sweetser had been appointed to both open CBA-CLE executive roles, while also assuming the open CBA Deputy Executive Director position. A volunteer board member with no prior operational management experience, who had chaired the committee performing the executive search, now controlled all three organizations.

40. In the same all-staff meeting where he announced his self-appointment, Sweetser declared that the offices were going remote for COVID-19; that the organization would be changing health insurance providers, potentially causing a gap in coverage; and that he would now be leading institutional DEI initiatives, based on his experience as the adoptive father of non-white children and his wife's management of ethnic cultural experience camps for minority children adopted into white families. Plaintiff had previously been asked to cover these camps for an edition of the Docket.

41. Plaintiff expressed concerns about the transition and programming plans. Sweetser responded by contacting Plaintiff directly and asking him to share any proof he had reason to feel uncomfortable, including specific incidents. Plaintiff described the Buckley confrontation and the subsequent firing of his managers, explaining that he felt unprotected and targeted as a person of color, a gay person, and the only man on his team, and that he was concerned about being used to recruit other marginalized people into that environment. Sweetser responded that these events were "in the past" and that the organization was supposed to be a "fun" place to work, telling Plaintiff he was welcome to work elsewhere if he thought that would be more

"fun." Sweetser also repeatedly said, "Of course we could all make more money somewhere else," indicating that he knew staff salaries were suppressed even as he subsumed three executive compensation packages into his own role.

### F. George Floyd, DEI Exploitation, and the Pattern of Extraction (2020–2022)

42. During the national George Floyd protests in summer 2020, the windows on the ground floor of Defendants' shared office building were broken. Leadership attempted programming and communications around racial justice. However, as the only Black member of staff, Plaintiff was uniquely impacted by these events and by repeated requests that staff contribute to DEI initiatives. These initiatives placed Plaintiff under heightened scrutiny while requiring him to do the unpaid emotional and intellectual labor of fixing the very problems affecting him most. No support, accommodation, or additional compensation was provided.

43. Throughout 2020–2022, Sweetser and Larson repeatedly told staff to "bring your whole selves to work" and encouraged employees to share personal information that leadership could use to highlight organizational diversity. When Plaintiff or other minority staff raised substantive concerns in meetings, Sweetser and Larson would contact them afterward to "discuss concerns." These conversations invariably consisted of Plaintiff explaining basic aspects of the minority professional experience while leadership thanked him for "sharing his perspective." No remedial action was ever taken. At subsequent meetings, Sweetser and Larson would describe how "fun" it was to learn from staff about the minority experience, while reminding everyone that "not everyone has the same background" discussing these issues, and that the priority was making white and straight volunteers comfortable doing this "forever work."

44. Plaintiff worked closely with Shanna Montoya, a Latina communications professional hired around the same time as Plaintiff. Montoya successfully launched the CBA Thrive message board and associated member benefits, requiring substantial technical work and community building. She also marketed and managed events, represented the organization in national conferences, and performed numerous high-level communications tasks demonstrating deep understanding of the membership and the evolving legal field. From 2020 through 2022, Montoya attempted multiple times to secure a director-level role. Each time she was denied, and the position was filled by a less-qualified white person with personal ties to Sweetser or existing management. When Montoya asked her direct supervisor, Loren Faye, what she could do to advance, she was told it would be "difficult" because she was perceived as "intimidating" and "angry," and that she "scared" people. Montoya left the organization shortly thereafter. Plaintiff repeatedly cited Montoya's experience to management as an example of discriminatory patterns in the office, and how they impacted the organization's ability to fulfill its mission.

45. For white employees like Larson, the organization's bylaws could be amended to permit advancement. For employees of color like Montoya and Plaintiff, no amount of effort, education, or demonstrated value was sufficient.

## G. The NITA Interlude: Reputation Poisoning and Homophobia (2022)

46. In early 2022, Publications Director Huotari told Plaintiff that a management opportunity had become available at the National Institute for Trial Advocacy ("NITA"), a closely affiliated organization in Louisville, CO that shared current and former staff members with CBA and CBA-CLE. Huotari said the role had been offered to her, but she thought Plaintiff

would be a better fit. She also told Plaintiff that Sweetser and Larson had already indicated they would not advance him further at CBA-CLE. With his path to advancement blocked and a $10,000 salary increase offered, Plaintiff accepted the NITA position.

47. On information and belief, Plaintiff's reputation as a "disruptive" employee was communicated to NITA before his arrival. Plaintiff experienced hostility from his first week, including homophobic and gender-based comments from staff members — some of whom had previously been employed at CBA-CLE and managed by Lisa Fischer, Plaintiff's future manager, during her prior tenure. When Plaintiff raised concerns with NITA's HR department, he was told the comments were merely "flirting" and he should not take them seriously. This was the first time in Plaintiff's career he had filed an HR complaint at any employer. Given Plaintiff's knowledge of the institutional issues at CBA around weaponized claims of sexual harassment, and the fact that these organizations shared staff during the relevant periods, Plaintiff thought it best to begin looking for employment elsewhere.

48. While Plaintiff was at NITA, CBA-CLE contacted him several times for assistance finishing projects, which he provided without compensation. After six months, Plaintiff contacted Huotari, and explained that he was preparing to leave NITA. Huotari offered him his old position back, and told Plaintiff that in his absence, it had become clear he had been doing most of the substantive work on the Publications team. Shortly thereafter, Huotari resigned and invited Plaintiff to her home to discuss the implications, telling him she thought he was qualified for the Publications Director role and encouraging him to apply. Plaintiff anticipated only that he would have the opportunity to apply for the vacant role through open posting, as was legally required.

49. Before leaving NITA, Plaintiff secured a salary increase for the legal editor he had managed, who was performing the editing work previously done by a staff of five.

**H. Return to CBA-CLE and the Title Demotion (2022–2023)**

50. Plaintiff returned to CBA-CLE in October 2022. He never received a formal offer letter or job description, and started at the same salary he had held before leaving for NITA. He did not press these issues, as he understood that he would be applying shortly for the vacant Publications Director position.

51. After Plaintiff started, Sweetser immediately announced that rather than filling the vacant Publications Director position, he would directly manage the publications department for six months to "better understand what you all do." This eliminated the promotion opportunity that had motivated Plaintiff's return.

52. In December 2022, Sweetser assigned Plaintiff to serve as program attorney for four months of a real estate CLE program. This was a $70,000/year role Plaintiff had previously applied and been rejected for on multiple occasions, which was then filled by younger, less experienced attorneys who quickly departed. Sweetser told Plaintiff, "I know you wanted that role, so I am giving you an opportunity to perform it," despite Plaintiff having been denied the position years prior and now holding a comparable full-time position and title. Plaintiff's duties consisted primarily of driving to the office in the evenings to set up food and give brief introductions. After the program ended, Sweetser repeatedly criticized Plaintiff's performance, without articulating any metrics or identifying specific deficiencies. He primarily objected to the way Plaintiff had dressed, despite Plaintiff wearing standard business professional attire like the

other presenters, and no dress code ever having been communicated. Sweetser also criticized Plaintiff for seeking guidance during the program, asking him if he had ever attended a CLE before.

53. In January 2023, Ellen Buckley retired, three years after filing regulatory claims triggered by Plaintiff's hire. This left two vacant positions: Legal Editor and Publications Director. With these vacancies, Plaintiff's workload increased substantially.

54. In February 2023, Sweetser told the publications team that he had run into Lisa Fischer at a grocery store and, after a short conversation, offered her the Director role. Fischer, a white woman, had a seven-year gap in her employment with CBA-CLE and no recent publications experience. Sweetser said he knew her from her prior tenure and believed she could "hit the ground running." In later filings with administrative agencies, Sweetser contradicted this account and claimed instead that "a former employee" — presumably Buckley —  had recommended Fischer. [Exhibit 20] If true, this means an outgoing employee, who had filed regulatory claims against the organization in reaction to Plaintiff's hiring, was permitted to hand-select her own replacement and his next manager in one fell swoop, finally completing her day-one attack from three years prior.

55. When the publications team objected to this non-competitive hiring, Sweetser said he would hire Fischer only as a Legal Editor and would post the Director role. [Exhibit 9] Two director positions were now open — Publications Director at CBA-CLE and Communications Director at CBA. Plaintiff applied for Communications Director through the posted process, and waited for open posting of the Publications Director role. The Communications Director role was ultimately combined with the role of the CBA/DBA/CBA-CLE IT Director, a white, straight male who had no substantial communications experience. Sweetser later told Plaintiff that some

staff had complained about sexist behavior from this director, but Sweetser had determined this was implausible because the director had been raised by a single mother and had a good relationship with her.

56. Also in February 2023, Sweetser asked Plaintiff to consent to an interview for a Staff Spotlight feature to be published for Black History Month. [Exhibit 10] The feature was conducted by Emma Pugliese, a junior member of the publications team. Plaintiff consented, concerned that refusal might harm his pending director applications. The resulting Staff Spotlight identified Plaintiff by photograph and described him as "Attorney Editor" and as a Black man from a family of lawyers, and memorialized his concerns about the Bar's approach to diversity and inclusion. This interview was distributed to approximately 18,000 members by email.

57. Within approximately three weeks of this publication, Sweetser changed Plaintiff's title from Attorney Editor to Legal Editor, without explanation. This required changing the masthead on all existing publications. The only justification offered was a comment in a team meeting that "we'll have three legal editors like we always have." No other employee had ever been demoted during Plaintiff's time with the organization. Plaintiff told Sweetser at the time that his Attorney Editor title carried significance — it communicated to diverse volunteers and young lawyers that the organization had an attorney on its editorial staff who could protect their professional interests. The change would also impact Plaintiff's ability to secure comparable roles at other organizations. Sweetser was unmoved.

58. In June 2023, rather than posting the Director role as promised, Sweetser promoted Fischer to "Publications Manager," a newly created title. Fischer, a white, straight woman with a seven-year employment gap who was hired without competitive process, on the recommendation of an aggrieved former employee, received a management title and authority over Plaintiff within

months of her return. Plaintiff, a Black, gay attorney with continuous service, a federal clerkship, and recent management experience at NITA, had his title stripped.

59. When Plaintiff asked in performance reviews for at least a regular 3.5% salary adjustment — his salary having been frozen since before his departure to NITA — Sweetser told him that annual raises would no longer be given, and that going forward his salary would only be adjusted if he accomplished something significant enough to deserve a bonus. In Plaintiff's experience, routine salary adjustment requests from minority staff were treated as ingratitude and insubordination under Sweetser's management.

### I. Fischer's Management, Scrutiny, and the Loch Ness Award (2023)

60. Under the new structure, Fischer ran weekly Publications staff meetings. She frequently cancelled these at the last minute for personal reasons, slowing production and creating communications problems. When meetings occurred, Fischer routinely commented on Plaintiff's dress, appearance, and facial expressions. On several occasions she stopped team calls to remark: "You have such an expressive face, Brendan, and we all know exactly what you're thinking. Why don't you share what you want to say?" Plaintiff's professional behavior and appearance were scrutinized in ways that no other team member — all white women — experienced.

61. Fischer also frequently described her process for recruiting diverse volunteer authors, a stated organizational goal. She would describe meeting minority attorneys at CBA membership events, evaluating whether they seemed "polite and friendly," and then looking them up online to determine if they were "qualified" enough to consider as potential authors. She described this

screening process on at least five occasions. To Plaintiff's knowledge, she never recruited a single minority volunteer author through this process. Plaintiff never heard Fischer describe checking the credentials of white or straight attorneys in this manner, although she explicitly stated she did so for gay and minority attorneys, even those who had expressed no interest in writing for Publications.

62. In the fall of 2023, Fischer and Pugliese organized a "high school yearbook superlatives" event at an all-staff meeting in the CBA offices. Plaintiff was presented with a piece of paper depicting a silhouette of the Loch Ness Monster, the branding for all three organizations, and the text: "Loch Ness Colleague — This goes out to that one person you can never seem to find. You're a legend!" [Exhibit 11] This was presented in front of the assembled staff and volunteers of all three organizations, many of whom had never met Plaintiff in person because the office had been on remote work for years. It was also later sent by email to the "CBADBAMVLCBACLE" mailing list comprising the staff of all three organizations plus Metro Volunteer Lawyers. The award was the first introduction many colleagues had to Plaintiff. It was greeted with laughter. No other employee received a similarly mocking award. The award implicitly questioned Plaintiff's behavior and engagement — which had been constantly scrutinized by management over the past several months — while also indicating that he was not held in professional esteem within the office.

63. Sweetser conducted Plaintiff's first evaluation under this structure in June 2023, which was neutral-to-positive. The only requests were that Plaintiff volunteer for additional unpaid work, and that he develop subject matter expertise across all books he edited. Sweetser stated verbally that Fischer was "not [Plaintiff's] manager" and would not evaluate him — a representation he would later reverse.

**J. DEI Training, Board Crisis, and Retaliatory Evaluations (2023–2024)**

64. On December 6, 2023, approximately nine months after the title demotion and the Staff Spotlight publication, and following months of his raising concerns about inefficient management and discriminatory treatment, Plaintiff received a performance evaluation that was surprising, unfounded, and materially inaccurate. [Exhibit 13] This was the first negative evaluation Plaintiff had received in his career at any employer. And it came from Fischer, who Plaintiff had been told was not his evaluating manager. The review said Plaintiff "still struggles with his editing skills" and directed him to "develop effective editing skills," while also saying he "displays positive behavior" and "tries to be helpful." The review also said, "Supervisor has received numerous complaints about the quality of his work," without substantiating these complaints or their sources.

65. Plaintiff responded that same day with a detailed email to the team explaining why he believed the evaluation was discriminatory, that he felt he was being pushed toward constructive discharge, and that the organization needed objective evaluation standards. [Exhibit 12] After receiving no response, on December 11 Plaintiff submitted another complaint to Sweester, Larson, Fischer, and the hr@cobar.org email account. [Exhibit 13]

66. The same evening as Plaintiff's initial complaint, December 6, 2023, the CBA Board of Governors held a meeting at which Sweetser was present. [Exhibit 14 at 3-4] The Board voted on a new diversity and inclusion plan. At this meeting, a conflict developed between CBA Executive Director Larson, CBA President Judge Nathaniel Baca, and Joint Management

Committee member Catherine Chan regarding racism and discrimination within the organization. Chan, an Asian-American woman, ultimately requested that the Board investigate her concerns.

67. The Board acted immediately, retaining consultant Dr. Yolanda Avent, a Black woman, to analyze the organization and interview board members. In a special meeting on January 3, 2024, Dr. Avent confirmed that the organization and its leadership had a significant discrimination and accountability problem, and presented this information to the board, with detailed recommendations. [Exhibit 14 at 26-39] The conclusions of Dr. Avent's report undermine CBA-CLE's claims that it managed an inclusive and legally compliant workplace during Plaintiff's employment.

68. Plaintiff filed charges with the EEOC and CDLE in December 2023 and January 2024 respectively, and told management he had done so. [Exhibit 15] From that time forward, Plaintiff was under formal anti-retaliation protection, and any adverse action against him carried a presumption of retaliation under applicable burden-shifting frameworks.

69. The board crisis between December 2023 and June 2024 resulted in the resignations of Larson, CBA Immediate Past President Ryann Peyton, and CBA President Judge Baca in April 2024, after a board vote to force disclosure of any legal claims against the organization. [Exhibit 16] On information and belief, Plaintiff's claims were the only ones pending. It is unclear whether the board was informed of Plaintiff's complaints and filings, or when. Some of these meetings were attended by counsel representing individual board members or executives, and by the Colorado Attorney General, whose Deputy served as CBA-CLE President, heightening the stakes for all involved. *Id.*

70. These meetings and resignations resulted in Catherine Chan being named the new CBA President, after she raised complaints against the previous president. She was also

permitted to form and directly manage several committees and working groups focused on internal relations and employment law. [Exhibit 17] Yet Plaintiff's own contemporaneous complaints — made by a paid employee with statutory protections — were never investigated, never substantiated, and ultimately characterized as implausible in federal filings. The disparity in institutional response between a volunteer board member's complaints and a staff member's formal discrimination charges is inexplicable absent discriminatory animus.

71. In early 2024, Defendants engaged attorney and CBA member Kathleen Nalty to provide four months of mandatory DEI training to all staff and management. This training addressed, among other topics, the Thomas Meyer study — research promulgated by the Colorado Supreme Court demonstrating that identical legal work product is rated lower when attributed to Black attorneys than when attributed to white attorneys. [Exhibit 18] Following this training, the decision-makers who had been taught to recognize this exact bias pattern replicated it in Plaintiff's evaluations. In May 2024, Fischer delivered a second negative evaluation that repeated the December 2023 evaluation nearly verbatim — confirming that the evaluations were not based on performance but on a fixed discriminatory assessment that the DEI training had done nothing to correct and may have helped to refine.

72. The EEOC contacted Plaintiff in June 2024. After discussions with the EEOC, Plaintiff determined that his pending CDLE filings, which included per se EPEWA violations carrying daily penalties, were the more effective administrative vehicle at that time, as the original EEOC filing did not cover adverse actions occurring in 2024. Plaintiff subsequently filed with the CCRD in October 2024, which cross-filed with the EEOC. [Exhibit 19] The Right to Sue letter in this action arises from that October 2024 filing.

### K. The Kachina Meeting

73. After the first DEI training session in February 2024, Sweetser contacted Plaintiff and requested they meet at a restaurant in Westminster, Colorado, ostensibly to help Sweetser "better understand" Plaintiff's concerns. At this meeting, Sweetser told Plaintiff that the board was being racist against Catherine Chan and would not help staff with discrimination issues. He described his adopted children in detail — a son of Indian descent, and a daughter of East Asian descent — and spoke at length about how much his non-white children had "taught" him about race. He described how this learning experience had led his wife to create cultural experience camps for adoptive families, representing more than nine different ethnic groups, all run by a single executive and requiring more than 650,000 hours of shift-based volunteer work each year from the families who pay to participate.

74. During this conversation, while discussing his son's experiences, Sweetser told Plaintiff that he had recently been surprised to learn that people of Indian descent sometimes get called "*the n-word*," even in Colorado. The Executive Director of an organization serving 16,000–20,000 Colorado attorneys — the same individual who controlled Plaintiff's salary, title, and advancement — casually referenced the most degrading racial epithet in the English language, in a crowded restaurant, to his only Black member of staff, while framing his experience with adopted Asian children and his wife's ethnic training camps as sufficient credentials for understanding racism and managing a diverse work force. Sweetser subsequently repeated these comments in all-staff meetings.

75. Plaintiff left this meeting knowing he was in a hostile work environment that was unlikely to improve. Every subsequent interaction confirmed this assessment. Despite continuing

to perform to professional standards, and participating in additional months of mandatory DEI

training, Plaintiff continued to receive negative feedback and no attempts at remediation, or

investigation of his pending regulatory claims. This continued until he received another negative

formal review in May 2024, and requested a follow-up meeting with management.

### L. The Final Meeting, Constructive Discharge, and CDLE Concealment (2024)

76. In Plaintiff's final meeting with Sweetser and Fischer on July 16, 2024 — a meeting

that lasted approximately two hours, in a small conference room at CBA offices — Defendants'

management made the following statements:

- *"You've never asked us about our families, and if you had you'd know we can't be racist. We have family members who are minorities and we love them just the same."*

- *"My daughter is a member of the LGBT community, I bet you didn't know that."*

- *"I bet your husband will be happy to hear this meeting went better than you thought it would. Is he still unemployed?"*

- *"You should have asked us if you wanted a different job, we know everyone in town and we could have told people all about you."*

- *"The Bar has hired Black people before with no problems. We had a Black receptionist for years and everyone just loved her."*

77. Plaintiff had not requested a discussion of race, gender, or sexual orientation. As he understood, the meeting was to address specific performance concerns referenced in his written evaluations. He had written to Sweetser and Fischer regarding his second negative performance evaluation in May 2024, noting that they had concerns about his performance and requesting an opportunity to meet to better understand those concerns. Fischer replied, "That's just what we hoped you would say," but those specific concerns were never substantiated or discussed.

78. When Plaintiff asked why other similarly situated employees, such as former Program Attorney Bridgett Moore, had been promoted while he was not, he was told they had shown "initiative" he lacked. When Plaintiff pointed out that he was the only team member who had recruited new authors or produced new books in recent years, he was told he was in a "dead-end job" and "should have known" this. He was told he would face increasing scrutiny from Fischer and Sweetser, and that the sole remediation measure would be requiring Plaintiff to memorialize his impressions after each contact with Fischer and submit them to Fischer for her review. When Plaintiff presented a specific disparate-impact analysis of how the absence of basic workplace protections disproportionately harmed minority and LGBT employees, management's response was: "You can just leave if you don't like it."

79. Later in July 2024, Plaintiff received a second Loch Ness Colleague award. While the first award might plausibly have been given without willful intent to harm, the second one cannot be defended. Plaintiff was under anti-retaliation protections and had already complained about the first award.

80. Plaintiff spoke in two additional DEI meetings, where departing director-level staff explained that the board was in open conflict with each other and remaining staff should know they were vulnerable. Plaintiff then tendered his two-week notice on August 2, 2024.

Unbeknownst to Plaintiff, two days before he submitted his resignation, the CDLE had mailed its formal charge to CBA-CLE's office, addressed to both Sweetser and Plaintiff. [Exhibit 15] Sweetser received and opened this correspondence. From that moment, Plaintiff was under anti-retaliation protection by formal administrative notice to Defendants' Executive Director.

81. Sweetser did not inform Plaintiff that the CDLE charge had arrived. On August 13, 2024 — during Plaintiff's two-week notice period — Sweetser submitted a response to the CDLE on behalf of CBA-CLE, without informing Plaintiff. [Exhibit 20] Sweetser did not inform the CDLE that Plaintiff had resigned. Plaintiff did not learn of any of this until approximately September 2024, after his employment had ended.

82. Plaintiff's constructive discharge was the culmination of escalating discrimination, retaliation, and hostility over seven years. No internal remedy was ever available: Defendants maintained no HR department, no complaint procedure, no grievance mechanism, and no process for employees to communicate with the governing board. The person overseeing the discrimination was the highest operational authority. The presence of judicial and institutional actors on the 160-person board made responsible escalation functionally impossible for most employees, especially attorney employees with Colorado licensure. Plaintiff exhausted every available avenue — raising concerns in staff meetings, participating in DEI programming, communicating in good faith with management, and finally filing with government agencies to secure anti-retaliation protections — and was told, repeatedly, to leave or face increased hostility.

**M. Administrative Proceedings**

83. Following his departure in August 2024, Plaintiff filed a charge of discrimination with the Colorado Civil Rights Division in October 2024. [Exhibit 19] The CCRD formally charged CBA-CLE in March 2025, after Plaintiff informed the membership of his experience on the CBA's own Thrive platform — the same platform Defendants had encouraged minority staff and members to use to "bring their whole selves" to the professional community. Defendants removed this posting. The CCRD formally charged CBA-CLE the following day. CBA-CLE initially agreed to CCRD mediation, but the matter was not resolved. Both parties then submitted full responses and replies, and the CCRD continued its investigation.

84. At the 180-day statutory date on which Plaintiff could request a right-to-sue letter, the CCRD contacted Plaintiff and suggested he do so, indicating that the issues that had surfaced were too complex for administrative determination. Plaintiff would have preferred a determination on the merits. However, the subsequent sua sponte recusal of the entire District of Colorado — caused in part by CBA-CLE's provision of mandatory continuing legal education to virtually every judge in the district — underscored the breadth of institutional entanglements that complicate any governmental resolution of claims against these Defendants.

85. Plaintiff also filed charges with the EEOC and the CDLE. The CDLE investigation remains open, including investigation of per se EPEWA violations carrying specific capped and uncapped daily penalties. Plaintiff received his Notice of Right to Sue and timely filed this action in December 2025.

## N. Post-Separation Retaliation

86. Following Plaintiff's departure, Plaintiff requested that Defendants remove his name from the organization's public website. Defendants refused. For approximately six months following Plaintiff's resignation and during the pendency of the CDLE investigation, Defendants continued to display Plaintiff's name on their website under the title "Legal Editor" — the demoted title that forms the basis of Plaintiff's discrimination claims. During this period, anyone searching Plaintiff's name — including potential employers, professional contacts, and the investigating agency — would find him publicly listed under a non-attorney title at an organization he had left under duress. Defendants' refusal to remove this listing, despite Plaintiff's request and despite their knowledge of the pending CDLE investigation, constituted ongoing retaliation causing concrete professional and reputational harm.

## O. Pattern of Discrimination Against Minority and LGBT Employees

87. Plaintiff was not alone in his experience. Throughout the relevant period, nearly every minority and LGBT employee who worked for Defendants experienced adverse treatment and departed. Some representative examples include:

88. **Sondra (Black woman):** Hired for a substantive role, reassigned to reception as punishment, told the organization had communicated negative information to potential employers, warned Plaintiff the organization was "racist," and departed.

89. **Shanna Montoya (Latina):** Launched the CBA Thrive platform, requiring substantial work and community building. Repeatedly denied director-level promotions that were awarded to less-qualified white candidates with personal connections to management. Told she was perceived as "intimidating" and "angry" and that she "scared" people, and departed.

90. **Marlow Hooper (Black man):** Hired as Program Attorney at CBA-CLE by the same terminated management who hired Plaintiff. Departed after approximately six months for a position as General Counsel at Toyota, in Texas. Direct comparator who highlights the differential between skills and qualifications required for Black staff and those sufficient for other staff members doing the same work, as well as the Bar's inability or unwillingness to retain Black attorney staff.

91. **Patrick Flaherty (gay white man):** CBA Executive Director, terminated and later accused of making inappropriate comments to Larson.

92. **Renatta Villa (Latina):** Hired as first HR Director by staff request. Subjected to repeated inappropriate comments about her ethnic identity and appearance. Scapegoated and forced out within approximately 18 months. Still referenced years after departure as the source of staffing problems that had predated her arrival, and as the reason for management's distrust of HR.

93. **Adrian Romano (Latino):** Falsely accused of inappropriate personal relationship with a sub-contractor, by another member of staff. Investigated, exonerated, and forced to settle for nuisance value after signing summary statements under duress. Sweetser later referenced these events to Plaintiff as evidence that the organization could appropriately resolve staff claims.

94. **Plaintiff Brendan Baker (Black, gay man):** Title demoted, salary suppressed, negatively evaluated, denied advancement, subjected to hostile work environment, and constructively discharged. Because Plaintiff was the only minority attorney on staff, other staff of all backgrounds frequently brought their concerns to him and requested that he attempt to resolve them with management, which made Plaintiff the focus of sustained retaliation.

95. Upon Plaintiff's departure, Defendants employed no other Black attorneys, no minority attorneys, and no openly LGBT attorneys; and there was a nearly 4:1 ratio of female to male employees.

## V. CLAIMS FOR RELIEF

## COUNT I

## Race Discrimination Under 42 U.S.C. § 1981

96. Plaintiff incorporates all preceding paragraphs by reference.

97. Section 1981 guarantees all persons the same right to make and enforce contracts, including employment contracts, as is enjoyed by white citizens. 42 U.S.C. § 1981(a). The right to make and enforce contracts includes the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

98. Plaintiff is Black. He was qualified for his positions and performed his duties competently or better throughout his employment. Defendants subjected Plaintiff to adverse employment actions including but not limited to: title demotion from Attorney Editor to Legal Editor; salary suppression relative to white comparators; denial of promotional opportunities awarded to less-qualified white employees without competitive process; retaliatory performance evaluations; hostile work environment, including the Executive Director's repeated references to a racial slur; assignment to entry-level duties not imposed on white attorneys; and constructive discharge.

99. But for Plaintiff's race, these adverse actions would not have occurred. Defendants promoted white employees with lesser qualifications, enhanced titles for white employees while stripping Plaintiff's, paid white employees with lesser credentials substantially more for comparable work, and responded to Plaintiff's discrimination complaints by telling him to leave. The inference of race discrimination is further supported by the pattern of adverse treatment of every minority employee who was hired by Defendants during the relevant period.

100. Section 1981 claims carry a four-year statute of limitations, are not subject to administrative exhaustion requirements, and provide for uncapped compensatory and punitive damages. Plaintiff seeks all available relief under this statute.

## COUNT II

### Race Discrimination Under Title VII

101. Plaintiff incorporates all preceding paragraphs by reference.

102. Title VII prohibits employment discrimination on the basis of race. 42 U.S.C. § 2000e-2(a). Defendants are employers within the meaning of Title VII. Plaintiff exhausted his administrative remedies by filing timely charges with the EEOC and CCRD and receiving a Notice of Right to Sue. Defendants discriminated against Plaintiff on the basis of his race through the adverse actions described herein. Plaintiff seeks all available relief under Title VII, including compensatory damages, attorney's fees, and costs.

## COUNT III

### Sexual Orientation Discrimination Under Title VII

103. Plaintiff incorporates all preceding paragraphs by reference.

104. Title VII prohibits employment discrimination on the basis of sexual orientation. *Bostock v. Clayton County*, 590 U.S. 644 (2020). Defendants knew Plaintiff was gay from the date of his hiring interview. Defendants subjected Plaintiff to adverse employment actions motivated in whole or in part by his sexual orientation, including the hostile comments referencing his husband, the homophobic environment documented by multiple gay employees, and the pattern of adverse treatment of LGBT employees. Plaintiff seeks all available relief under Title VII.

## COUNT IV

### Retaliation Under Title VII

105. Plaintiff incorporates all preceding paragraphs by reference.

106. Title VII prohibits retaliation against employees who oppose discriminatory practices or participate in Title VII proceedings. 42 U.S.C. § 2000e-3(a). Plaintiff engaged in protected activity by raising discrimination concerns to management, filing EEOC and CDLE charges, and participating in CCRD proceedings. Following this protected activity, Defendants subjected Plaintiff to adverse actions including retaliatory evaluations, hostile meetings, the second Loch Ness Colleague award, increased scrutiny, constructive discharge, concealment of the CDLE charge, and post-separation refusal to remove his name from the website under the demoted title. The temporal proximity between Plaintiff's protected activity and these adverse

actions, combined with the direct evidence of retaliatory motive, establishes a causal connection.

Plaintiff seeks all available relief.

## COUNT V

### Race Discrimination Under the Colorado Anti-Discrimination Act

107. Plaintiff incorporates all preceding paragraphs by reference.

108. CADA prohibits employment discrimination on the basis of race. C.R.S. § 24-34-402. As amended by the Protecting Opportunities and Workers' Rights Act ("POWR Act"), effective August 7, 2023, CADA eliminated the "severe or pervasive" standard for hostile work environment claims, replacing it with a standard requiring only that the conduct be unwelcome and either subjectively offensive to the complainant or objectively offensive. The conduct described herein satisfies both the pre-POWR and post-POWR standards. CADA provides for uncapped compensatory and punitive damages under Colorado law. Plaintiff seeks all available relief.

## COUNT VI

### Sexual Orientation Discrimination Under CADA

109. Plaintiff incorporates all preceding paragraphs by reference.

110. CADA prohibits employment discrimination on the basis of sexual orientation. C.R.S. § 24-34-402. Defendants discriminated against Plaintiff on the basis of his sexual orientation through the adverse actions described herein, including but not limited to the hostile

comments referencing his husband, the creation of a work environment where multiple gay employees reported homophobic conditions, and the pattern of adverse treatment of LGBT employees. The POWR Act's lowered threshold for hostile work environment claims applies to conduct occurring after August 7, 2023. Plaintiff seeks all available relief.

## COUNT VII

### Retaliation Under CADA

111. Plaintiff incorporates all preceding paragraphs by reference.

112. CADA prohibits retaliation against employees who oppose discriminatory practices or file discrimination charges. C.R.S. § 24-34-402(1)(e). Plaintiff engaged in protected activity and suffered the retaliatory adverse actions described herein. Plaintiff seeks all available relief under CADA, including uncapped compensatory and punitive damages.

## COUNT VIII

### Violations of the Equal Pay for Equal Work Act

113. Plaintiff incorporates all preceding paragraphs by reference.

114. The Equal Pay for Equal Work Act, C.R.S. §§ 8-5-101 et seq., requires employers to provide equal pay for substantially similar work regardless of sex, and separately requires employers to disclose in job postings the hourly rate or salary compensation and a general description of benefits. Employers must also announce promotion opportunities to all employees and make reasonable efforts to announce job opportunities to all employees.

115. Defendants violated EPEWA by: (a) failing to post the Publications Manager/Director role awarded to Fischer without competitive process; (b) failing to provide transparent compensation information for positions filled internally; (c) improperly suppressing Plaintiff's pay based on their knowledge of his previous salary in different positions under different organizational structures; (d) repeatedly downgrading Plaintiff's title and compensation when he filled a role previously held by a white woman at a higher salary and title; and (e) failing to keep and produce a record of Plaintiff's complaints. The CDLE investigation into these violations, several of which included specific capped and uncapped daily damages, remains open. Plaintiff seeks all available relief including back pay, liquidated damages, and injunctive relief.

## COUNT IX

### Civil Conspiracy

116. Plaintiff incorporates all preceding paragraphs by reference.

117. Defendants CBA-CLE, CBA, and DBA, acting through Sweetser, Fischer, Larson, and others, engaged in a civil conspiracy to deprive Plaintiff of his civil rights, suppress his complaints, and prevent organizational decision-makers from learning of and remedying discriminatory conduct. Specific overt acts in furtherance of this conspiracy include: Sweetser's self-appointment to control all three organizations; the coordinated title demotion following the Staff Spotlight publication; Fischer's non-competitive hiring and subsequent authority over Plaintiff; the retaliatory evaluations delivered on a coordinated timeline; the concealment of the CDLE charge from Plaintiff; the failure to inform the CDLE of Plaintiff's resignation; Sweetser's

responses to administrative agencies without board authorization; and the post-separation refusal to remove Plaintiff's name from the website. These acts were undertaken with the shared purpose of protecting Sweetser and other management from accountability for discrimination, and they caused Plaintiff concrete harm. Plaintiff seeks compensatory and punitive damages.

## COUNT X

### Alter Ego / Single Employer

118. Plaintiff incorporates all preceding paragraphs by reference.

119. CBA-CLE, CBA, and DBA are alter egos of one another and operate as a single integrated enterprise. As detailed in the Parties section of this Complaint, they share executive leadership, office space, staff, financial oversight, governance, and centralized control of labor relations through the JMC. Employees are transferred between entities, assigned duties spanning all three organizations, and managed by the same individuals. Sweetser simultaneously held executive positions at CBA-CLE and CBA while setting policy for DBA. The entities' nominal corporate separateness is a fiction that should be disregarded for purposes of liability, and all three entities are jointly and severally liable for the acts alleged herein. Plaintiff seeks declaratory relief establishing the single-employer relationship and reserves the right to seek leave to add individual defendants as warranted by discovery.

## VI. DAMAGES

120. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer:

121. **Economic damages** including but not limited to: back pay representing the difference between Plaintiff's actual compensation and the compensation he would have received absent discrimination; front pay representing future lost earnings; lost benefits; and costs associated with Plaintiff's forced career disruption, eviction, cross-country move, ongoing unemployment, and planned international relocation.

122. **Compensatory damages** for emotional distress, humiliation, reputational harm, loss of professional standing, and the personal toll of enduring seven years of escalating discrimination and retaliation while performing the unpaid labor of educating his employers about the very bias they were directing at him, as well as for the work product they continue to sell with his name and demoted title.

123. **Punitive damages,** which are uncapped under § 1981 and CADA. Defendants' conduct was willful, wanton, and undertaken with reckless disregard for Plaintiff's rights. The organization maintained no HR function, no complaint procedure, and no mechanism for board oversight of management. The individual whose conduct is at issue controlled the organization's response to every complaint, concealed information from governing bodies, and ensured that no institutional check on his authority existed. Defendants cannot establish a good-faith defense under *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), because they made no good-faith effort to comply with antidiscrimination law — they structurally prevented any such effort from being made.

124. **Attorney's fees and costs** at market rates, reflecting the substantial legal work Plaintiff has performed as a licensed attorney representing himself in complex federal litigation. Defendant formally requested to the Court that Plaintiff be held to a licensed attorney standard, as opposed to a lower pro se standard; and Defendant's conduct directly diminished Plaintiff's

ability to secure qualified and non-conflicted counsel, supporting the award of reasonable attorney fees for his work.

125. **Injunctive and declaratory relief** including but not limited to: a declaration that CBA-CLE, CBA, and DBA operate as a single employer; an order requiring Defendants to implement an HR function, complaint procedures, job descriptions, and objective evaluation criteria; an order requiring Defendants to comply with EPEWA posting and transparency requirements; and an order requiring Defendants to establish a mechanism for board oversight of executive management independent of the Executive Director.

## VII. JURY DEMAND

126. Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted this 15th day of April, 2026,

\_\_/s/\_\_\_Brendan Baker_____
Brendan Baker, Pro Se
503 Hilltop Ln
Riva, MD 21140
bejbaker@gmail.com
(716) 969-0334

LIST OF EXHIBITS:

1. CBA/DBA/CBA-CLE Organizational chart, February 2024
2. The Colorado Lawyer – Greg Martin Retirement article, October 2018
3. Docket Magazine Cover and Editor's Note, March 2018
4. The Colorado Lawyer – Bar News feature, March 2018
5. Docket Magazine – Report from Cuba, July 2018
6. Salary Adjustment Memo, May 2019
7. Program Attorney application cover letters, February and October 2019
8. Communications regarding Attorney Editor position offer, January 2020
9. Posting to staff announcing hiring of Lisa Fischer, March 2023
10. Staff Spotlight for Black History Month, February 2023
11. Loch Ness Colleague "Staff Appreciation" Award, October 2023 and July 2024
12. Internal discrimination complaint, December 6, 2023
13. Internal discrimination complaint, December 11, 2023
14. CBA Executive Council Meeting packet, February 2024
15. Colorado Department of Labor complaint, January (filed)/July 2024
16. CBA Executive Council Meeting packet, April 2024
17. CBA Executive Council Meeting packet, June 2024
18. Thomas Meyer memo study promulgated by Colorado Supreme Court
19. CBA-CLE response to CDLE complaint, August 2024
20. Colorado Civil Rights Division Complaint, October 2024 (filed)/March 2025
21. CBA-CLE CCRD Position Statement, July 2025